**BLUE PACIFIC MANAGEMENT CORP.,**
**Agent for PAGO PLAZA, Plaintiff**

v.

**PAISANO'S CORP. and JAMES STEPHENS,**
**Defendants**

High Court of American Samoa
Trial Division

CA No. 62-91

December 9, 1992

Before KRUSE, Chief Justice, MATA'UTIA, Associate Judge, BETHAM, Associate Judge.

Counsel:     For Plaintiff, William H. Reardon
             For Defendants, John L. Ward II

Plaintiff, Blue Pacific Management, manages and operates the Pago Plaza (hereinafter the "Plaza"), a commercial complex of office and retail rental space. Defendant James Stephens operates within the Plaza a popular deli/pizzeria known as "Paisano's."[1] Although Paisano's has been in business at the Plaza since mid-1989, the parties have never

---

[1] We were not clear on the evidence whether Paisano's was a separate corporate entity. While Stephens testified that he had gone through the incorporation process, he also talked about being in "partnership." Hereinafter, unless the context otherwise suggests, we refer to defendant(s) as "Stephens" and vice-versa.

managed to finalize a written lease agreement satisfactory to the other. Unfortunately, they did not bother to resolve all the details of their relationship prior to their headlong rush into costly improvements to the premises--plaintiff's manager, Mr. James McGuire, ventured a figure of $86,000 in "build out" costs, while Stephens' capital outlay estimates varied from $180,000 on the stand to $150,000 in an earlier affidavit. Evidently, the mutual priority seemed to be the speedy establishment of a fast-food restaurant; consequently, McGuire and Stephens, both obdurate in their respective positions, have quarreled ever since about their perceived commitments. Plaintiff, who is now well and truly fed-up with the deadlock in discussions, wants the defendant out altogether from the Plaza. On the other hand, defendant, who is now well- and truly-established in the Plaza and has also generated a certain amount of goodwill at the location, wants specific performance of a solemn handshake.

## FACTS

The genesis of the dispute before us is the monthly electric bill. The evidence reveals the following facts: The parties initially met in mid-1988 after McGuire had heard that Stephens was planning to set up a pizzeria across the street. At the time, the Plaza was a relatively newly-completed project, and its management was earnestly seeking tenants. Its planners had apparently set aside 2700 sq. ft. of ground-floor area for the very sort of business activity which Stephens was proposing; that is, activity that would generate traffic into the Plaza and thereby enhance business opportunities within the complex. McGuire had been unsuccessful in his previous attempts to lease the space. According to Mr. Don Fuimaono, one of the Plaza's earlier tenants, the area had been "dead space" for about three years until Paisano's began construction, in anticipation of occupancy, in 1988. Mr. Fuimaono further testified that as then-president of the Plaza's Merchants Association, he welcomed the Stephens' proposal as something good for business, since there was hardly anyone in the complex at the time. Accordingly, McGuire had approached Stephens to attract him to the Plaza.

As it turned out, plaintiff had more space than Stephens' immediate budget and pizzeria plans called for; nonetheless, McGuire was just as anxious to secure a fast-food tenant as Stephens was keen to set up business. Although their numerous discussions alluded to Stephens' potential development of the total 2700 sq. ft. area, the parties only reached agreement with respect to half of this available floor space. It was verbally agreed that plaintiff would lease, and that defendant

would take on lease, 1200 sq. ft. (hereinafter "suite 107") for the fast-food business. It was further agreed that the lease would be for a term of five years with an escalating monthly rental of $800 for the first year, $1320 for the second, $1440 for the third, $1560 for the fourth, and $1920 for the fifth. Although generally contemplated, future development plans of the total area (indeterminately referred to by Stephens as "phase 2") was, it seems, put on the back burner for further discussion while the parties focused their immediate effort on setting up the restaurant (and, hopefully, traffic). As events subsequently unfolded, the dialogue on phase 2 was eventually displaced entirely by an intensifying argument over the monthly electric bill.

On the concluded tenancy, plaintiff conceded at trial that defendant was current on rent. On the question of utilities, the understanding was that plaintiff would be responsible for his own supply needs and that some sort of meter would be later fitted to the premises for determining the restaurant's electrical usage. However, as an incentive to Stephens, McGuire also offered to absorb the cost of electricity, or in the parties' terminology a "credit," attributable to air-conditioning during Plaza's normal business day. Before the installation of a meter, the parties operated on estimates, with McGuire's billing Stephens a monthly charge of $1,200, a figure which was apparently satisfactory to the latter. In late September 1988, a meter was finally installed; however, plaintiff not only hooked up all of the restaurant's electrical outlets to the meter, but also the air-conditioning unit for the entire 2700 sq. ft area as well. The monthly billings increased steadily thereafter, and it was not too long before Stephens began to complain. Eventually, he developed his own schedule of payments quite unrelated to the utility billings presented by plaintiff. By the end of March 1991, the parties' differences on the utility bill was, according to plaintiff's reckoning, about $14,000. Plaintiff filed suit, seeking summary eviction pursuant to A.S.C.A. §§ 43.1401 *et seq*. Under pressure of suit, which was subsequently dismissed, Stephens responded, on April 4, 1992, by sending plaintiff a check in the amount of $10,222.54, with the notation that he was withholding the sum of $3,900, or $300 per month, as offset for the cooling costs of CDI Travel, another tenant that plaintiff had in the meantime set up in a part of the adjoining undeveloped area (hereinafter suite "106"). The evidence shows that Stephens was given access to 106 to accommodate his need for a rear entrance to the restaurant. To this end, McGuire had a door installed between 107 and 106 as a "courtesy" to the defendant, with each party keeping a key. Over the months, as various offers and counter-offers dragged on without fruition, Stephens started using 106 for an office, a storage area, and

60

even, at one point in time, a bakery. At the same time, the evidence also revealed that plaintiff had in the interim built out 450 sq. ft. of 106 (hereinafter suite "106B") which it leased out to CDI Travel. This tenancy lasted for the period March 1990 to March 1991, during which time McGuire had suffered CDI's cooling needs to be on Paisano's meter and account.

Shortly before the filing of this suit, plaintiff's attorney, by letter dated April 8, 1991, notified the defendant that its "license or permissive use" of 106 was terminated and that defendant had seven (7) days to quit the area it was then using or be subject to a monthly rental assessment of $1.50 per square foot "on a strictly hold over basis." On May 17, 1991, plaintiff's attorney further followed up on this demand for rent if defendant continued to hold over.

After dismissal of the first suit, the quarrel over the electric bill continued without resolution. As this issue dominated their attention, McGuire and Stephens became further and further estranged on the idea of phase 2 and expanded development by defendant. On May 24, 1991, plaintiff filed this action seeking repossession as well as damages for defendant's non-payment of the utility charges (the offset) and his continuing use of 106 after notice to quit and yield-up the premises. Defendant also filed a counterclaim, arguing the conclusion of a five-year verbal lease with an option to renew. Claiming substantial performance of the lease on its part, defendant seeks specific performance, plus damages for breach by plaintiff in its failure to allow the correct "credit" according to the lease agreement.

## DISCUSSION

### I. Lease

At common law, an oral lease is valid. 49 Am. Jur. 2d *Landlord and Tenant* § 30. It seems clear on the evidence that the parties had entered into an oral lease on 1200 sq. ft. of floor space for a period of five (5) years at the escalating rental schedule of $800 for the first year, $1320 for the second, $1440 for the third, $1560 for the fourth, and $1920 for the fifth. On the other hand, we find that the evidence did not substantiate defendant's claim to an option for a further term of five years.

61

Plaintiff submits that the oral lease agreement is invalid for want of compliance with the statute of frauds, A.S.C.A. § 37.0211.[2] Plaintiff goes on to argue that the resulting lease was, therefore, either a tenancy at will or a tenancy on a month-to-month basis because an anticipated written agreement was never concluded by the parties. We disagree. Assuming arguendo that A.S.C.A. § 37.0211 applies to lease agreements, the enactment "does not abridge the power of [the] court to compel the specific performance of any agreement . . . in the case of part performance." *Id.*; *see also Manoa v. Jennings*, 21 A.S.R.2d 23, 24-25 (Land & Titles Div. 1992). Here the salient terms of the lease (rent, duration, and purpose) are not only clearly evident, but performance on the part of the defendant is also equally clear. The defendant has, to his detriment, set up a fast-food restaurant in the Plaza following a sizeable outlay of capital; over the succeeding years defendant has not only been billed for but has also paid the stipulated graduated rent. Further, the evidence discloses an agreement on the part of plaintiff to absorb daytime electricity costs for air-conditioning. The promised "credit" was fixed by McGuire at $200 per month and was subsequently applied to Paisano's monthly billings. We thus conclude that defendant's substantial performance created an enforceable oral lease.

## II.  Holdover Tenancy

We next consider plaintiff's damages claim relating to defendant's continued use of 106, notwithstanding notice to quit. At best, defendant had a mere personal license to 106 pending negotiations of a lease agreement on the total 2700 sq. ft. area. This license was given in contemplation of a lease that would have eventually resulted in defendant's taking over the entire area, suites 107 and 106. Those negotiations, however, have been totally ineffectual, and the subject matter thereof has become, at least as far as plaintiff is concerned, closed. The above-noted letters of April 8, 1991, and May 17, 1991, from plaintiff's attorney unequivocally noticed revocation of that license. Accordingly, defendant's continued use thereafter of a part of 106 was, in our view, an acceptance of plaintiff's limited offer of a tenancy "on a hold over basis" at a rental of $1.50 a sq. ft. We hold that defendant is liable accordingly for rent or damages at the rate of $1.50 per square

---

[2] A.S.C.A. § 37.0211 provides that "[n]o agreement for the sale of real property or of any interest therein is valid unless the same, or some note or memorandum thereof be in writing and subscribed by the party to be charged or his agent thereunto authorized in writing."

foot on 1050 sq. ft. of suite 106 (2700 total sq. ft. - 1200 sq. ft. on lease to defendant - 450 sq. ft. leased to CDI = 1050 sq. ft.), accruing from April 15, 1991 (seven days' notice from April 8, 1991) to the date of judgment herein or date of actual surrender of 106, whichever is/was sooner.

### III.  Monthly Electric Bill

We next consider the parties' respective claim and counterclaim for damages relating to the electric bill.  Stephens' complaints about the electricity are not without merit.  First, the $200 monthly credit ($8.40 per day x 24 days) was a figure which McGuire attributed to a Mr. Elmer Gabbard, an electrical contractor.  Mr. Gabbard was said to have arrived at this figure from calculations incorporating nameplate data found on the air-conditioning unit.  Mr. Gabbard, however, was not called to testify and explain the calculation attributed to him.  On the other hand, a Mr. Alex Janeiro, another electrical contractor, did take the stand, but he gave a significantly higher daily figure of $35.63.  Mr. Janeiro testified that from amperage readings taken from both the air-conditioning unit's evaporator and condenser, he first calculated kilowatt hours; that he then applied the American Samoa Power Authority's (ASPA) schedule of rates and arrived at a dollar figure for electrical consumption over an eight-hour period.  In these circumstances, we conclude that the direct testimony of Mr. Janeiro, as opposed to the hearsay figure attributable to Mr. Gabbard, is the more reliable evidence.  The testimony of yet another electrician, a Mr. Peter Kupu, further lends support to this conclusion.  From amperage readings and calculations which Mr. Kupu had undertaken on November 20, 1991, he found that the air-conditioning unit, condenser and evaporator, was effectively consuming 75% of the electricity going through Paisano's meter.  Considering this consumption capacity against the average monthly billings to Paisano's, the $200 monthly figure employed by McGuire does not, in our view, correctly reflect day time cooling costs.  We conclude that the figure of $35.00 per day more accurately reflects the agreed "credit".  Second, we find that even the $200 "credit" was not consistently allowed by plaintiff in its monthly billings to the defendant.  A perusal of plaintiff's billing file (exhibit "18") shows that for the period from the commencement of the lease to the date of the filing of this action, plaintiff had omitted to give defendant this credit on at least six (6) billing occasions.  Third, we note, after comparing the billing file with ASPA's Fuel and Pumping Charges Schedule (*see also* exhibit "18"), that plaintiff's employee responsible for calculating Paisano's monthly billings had used the wrong surcharge indexes in the latter

months. Fourth, the effective charging of CDI's air-conditioning costs to the unwitting defendant's account for a one-year period is, to say the very least, at odds with plaintiff's covenant to be responsible for daytime charges. We also note in passing that plaintiff's accounting system leaves something to be desired. Certain errors, including some of those noted above, were picked up by plaintiff in its pretrial audit and resulted in some last-minute adjustments to its accounts at the eve of trial. Indeed, Stephens complained on the stand that he was only just then finding out about certain adjustments to the electricity account as presented to the court.

From the foregoing, we conclude as follows: for the duration of his occupation of 106 (the duration of the license plus holdover), defendant is liable for the total air-conditioning costs to 107 and 106 (the entire 2700 sq. ft. area) less a monthly credit in the amount of $850 ($35 x 24 days). This monthly credit is due defendant from the time of the first meter-based billing; however, for each month of the lease where plaintiff had allowed a $200 credit to defendant's meter-based billing, the monthly credit figure as heretofore found shall be discounted accordingly. We further conclude that defendant is not liable for the cooling costs of CDI Travel. However, considering that the air-conditioner was drawing about 75% of the load measured at Paisano's meter, and after taking into account an average of the monthly billings where the $200 credit was omitted, as well as the extent of the area occupied by CDI (450 sq. ft.), we conclude that a more accurate figure representing CDI's monthly cooling costs is $200 and not $300 as defendant claimed by way of offset. Accordingly, defendant shall have as offset, $200 per month for the duration of CDI's tenancy.

### ORDER

On the foregoing, plaintiff shall, within 20 days of date hereof, file with the Clerk a verified accounting on damages accruing, consistent with our findings and conclusions herein, by reason of defendant's holdover of suite 106, with a copy of that accounting to be served upon defendant. The defendant shall, within 20 days of date hereof, file with the Clerk a verified accounting of the electricity credit under the lease agreement, consistent with our findings and conclusions herein, with a copy of that accounting to be served upon plaintiff. Each party shall have ten days to file any opposition to the accounting filed by the other, and if there be none, judgment will be entered accordingly. Otherwise, the Clerk shall thereupon set this matter for further hearing on the accounting opposed.

It is so ordered.

(As corrected April 30, 1993)